FILED
CLERK, U.S. DISTRICT COURT

Dec 29, 2014

CENTRAL DISTRICT OF CALIFORNIA
BY: _____PMC_____ DEPUTY

JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Siamak Hodjati, | Case No. CV 13-05021 SVW |
| Plaintiff, | |
| v. | ORDER AFFIRMING DENIAL OF BENEFITS AND GRANTING JUDGMENT IN FAVOR OF DEFENDANTS |
| Aetna Life Insurance Co., et al., | |
| Defendants. | |

## I.   INTRODUCTION

Siamak Hodjati brought this action for benefits pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., against Aetna Life Insurance Company Inc.  The Court held a trial on the administrative record on March 4, 2014.  For the reasons set forth below, judgment is granted in favor of Defendants.

## II.   FINDINGS OF FACT

When presented with motions for judgment under Federal Rule of Civil Procedure 52, "the court conducts what is essentially a bench trial on the record, evaluating the persuasiveness of conflicting testimony and deciding which is more

1  likely true." *Caplan v. CNA Fin. Corp.*, 544 F. Supp. 2d 984, 990 (N.D. Cal. 2008)

2  (citing *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094–95 (9th Cir. 1999)).

3  Rule 52 "requires a court to 'find the facts specially and state separately its

4  conclusions of law thereon.'" *Vance v. Am. Hawaii Cruises, Inc.*, 789 F.2d 790,

5  792 (9th Cir. 1986) (quoting Fed. R. Civ. P. 52(a)).  The Court, however, "is not

6  required to base its findings on each and every fact presented at trial." *Id.* at 792.

7  The following constitutes the Court's findings of fact.

8           **A.    ADP TotalSource Program**

9           Siamak Hodjati worked for Payless Cellular, Inc.  Payless Cellular contracts

10  with ADP for administration of its employees' health and disability benefits.

11  Specifically, Payless Cellular subscribes to ADP's TotalSource program, which

12  operates under a "co-employment" model, whereby the customer (here, Payless

13  Cellular) retained day-to-day control over the company while ADP manages

14  critical human resources and employee benefits administration responsibilities.

15  (A.R. 001-03, 031, 0596-97, http://www.adp.com/solutions/

16  employer-services/totalsource.aspx).  As part of ADP's services for Payless

17  Cellular, ADP entered into a Group Accident and Health Insurance Policy with

18  Aetna.  (A.R. 031).  Aetna's long-term disability coverage—the benefit plan at

19  issue in this case—consists of a "'shell' containing general provisions relating to

20  policyholder/insurance company matters," and a "certificate" that includes a

21  number of separate health and disability plans.  (A.R. 031-043).

22           **B.    Aetna's Long-Term Disability Plan**

23           Aetna's long-term disability plan provides monthly benefits to enrolled

24  employees who are disabled and unable to work because of an injury, illness, or

25  pregnancy-related condition.  (A.R. 006).  The test for disability is set out in the

26  plan as follows:

27           From the date that you first became disabled and until monthly benefits are

28           payable for 24 months you meet the test of disability on any date that:

- You cannot perform the material duties of your own occupation solely because of an illness, injury or disabling pregnancy-related condition; and

- Your earnings are 80% or less of your adjusted predisability earnings.

After the first 24 months of your disability that monthly benefits are payable, you meet the plan's test of disability on any day you are unable to work at any reasonable occupation solely because of an illness, injury or disabling pregnancy-related condition.

(A.R. 007 (emphasis omitted)).  The plan defines "material duties" as "Duties that: Are normally required for the performance of your own occupation; and Cannot be reasonably omitted or modified."  (A.R. 023 (emphasis omitted)).  "Illness" is defined as:

A pathological condition of the body that presents a group of clinical signs and symptoms and laboratory findings peculiar to it and that sets the condition apart as an abnormal entity differing from other normal or pathological body states.

(A.R. 022).

### C.   Hodjati's Disability Claim

On September 2, 2011, Hodjati stopped working because of frequent headaches, memory loss, and hand tremors.  (A.R. 306).  He filed a long-term benefits claim with Aetna on November 3, 2011.  (A.R. 127, 271).  Over the course of the next four months, Hodjati provided Aetna with information on his claimed disability.  Specifically, Hodjati submitted a job analysis worksheet, evaluation notes from multiple visits to Dr. Howard Baer, and a CAT scan of his head.

### 1.   Job Analysis Worksheet

In November 2011, Hodjati returned a completed job analysis worksheet to Aetna.  (A.R. 284).  According to the worksheet, Hodjati worked as a general

1   manager for Payless Cellular, Inc., and his job duties included "business

2   development, negotiat[ing] new contracts, lead[ing] meetings, [sales and

3   marketing, and supervising] the day to day operations." (*Id.*).  Hodjati noted that

4   he sometimes had to operate a vehicle for work, and he occasionally had to

5   physically grasp things in the office. (*Id.*).

6                   2.      September 8, 2011 Appointment with Doctor Baer

7        Hodjati first met with Dr. Baer on September 8, 2011.  (A.R. 339).  Hodjati

8   reported that he suffered continuous headaches, memory loss, and tremors in both

9   his hands.  (*Id.*).  Hodjati told Dr. Baer that his headache and memory loss made it

10  impossible for him to continue to work as a manager of a wireless business, where

11  he worked six days a week for twelve hours a day.  (*Id.*).

12       Dr. Baer conducted a physical exam and concluded that Hodjati was

13  "well-nourished" and "in no obvious distress." (*Id.*).  Dr. Baer noted some mild

14  pain in Hodjati's neck, but he did not detect any other physical difficulties.  (*Id.*).

15  In his concluding remarks, Dr. Baer wrote that Hodjati suffered from cephalgia, i.e.

16  headaches, from a cause "to be determined;" a tremor; and neck pain.  (*Id.*).  Dr.

17  Baer ordered a CT scan of Hodjati's head and started Hodjati on 75 milligrams per

18  day of Effexor, SNRI inhibitor.  (*Id.*).

19                  3.      September 21, 2011 CT Scan

20       Hodjati underwent a CT scan on September 21, 2011.  (A.R. 347).  Dr. Loc

21  Tran, a board certified neuroradiologist, prepared a report on the scan.  (A.R. 348).

22  According to Dr. Tran, Hodjati's brain displayed normal architectural features and

23  density characteristics, and it lacked any discernable masses, brain lesions, or

24  indicia of restricted blood supply.  (A.R. 347).  In sum, the CT scan was

25  unremarkable.  (*Id.*).

26                  4.      October 26, 2011 Appointment with Doctor Baer

27       Hodjati visited Dr. Baer again in late October.  He repeated his complaint of

28  "persistent head pain." (A.R. 324).  The headache was "intermittent, but present

4

every day"; however, it was  less severe and less frequent now that he was "away from work and the stress of employment." (*Id.*).  Dr. Baer again conducted a physical examination of Hodjati, noting no abnormalities.  (*Id.*).  And he further stated that Hodjati's "neurologic exam [was] within normal limits." (*Id.*).  Dr. Baer prescribed Tramadol as a pain reliever, advising Hodjati to come back in about a month.

### 5. November 21, 2011 Appointment with Doctor Baer

In a November 21, 2011 appointment with Dr. Baer, Hodjati continued "to complain of intractable headache, some memory loss, pain in his upper neck[,] [and] a persistent tremor." (A.R. 325).  Dr. Baer detected a fine resting tremor in both upper extremities. (*Id.*).  Dr. Baer decided that Hodjati would continue his present medications, and the two scheduled another appointment. (*Id.*).

### 6. November 30, 2011 Appointment with Doctor Baer

Nine days later, Hodjati repeated his complaints of headaches, memory loss, hand tremors, and upper neck pain.  (A.R. 332).  Specifically, the headache was "now intermittent," and his neck pain radiated into the "posterior [part of the] skull." (*Id.*).  Hodjati then explained that his memory problem was "present primarily when he [was] in a group of people." (*Id.*).  And Dr. Baer again observed a tremor in both of Hodjati's hands.  (*Id.*).   However, Dr. Baer reiterated his opinion that the "neurologic exam [was] normal." (*Id.*).  Dr. Baer said that he would consider the use of Inderal, a non-selective beta blocker, if Hodjati's symptoms persisted. (*Id.*).

### 7. January 4, 2012 Appointment with Doctor Baer

Hodjati again met with Dr. Baer on January 4, 2012.  (A.R. 333).  Hodjati continued to complain of near constant headaches and hand tremors. (*Id.*).  Dr. Baer's neurologic exam of Hodjati revealed "normal deep tendon reflexes." (*Id.*).  Dr. Baer prescribed Indeneral.  (*Id.*).

### 8. February 1, 2012 Appointment with Doctor Baer

When Hodjati met Dr. Baer in February 2012, he told the doctor that his condition had not improved and the medication was ineffective. (A.R. 345). And Dr. Baer concluded that "[e]ssentially all the symptoms have not changed over the past 4-6 months." (*Id.*). Dr. Baer's physical exam notes revealed the same fine tremor in Hodjati's hands, but Dr. Baer apparently found that Hodjati had "no speech impediment" and normal reflexes. (*Id.*). Dr. Baer discontinued Hodjati's use of Inderal and decided to refer Hodjati to a neurologist. (*Id.*).

**D.     Aetna's Communications with Hodjati and Requests for Medical Records**

Hodjati submitted the aforementioned information to Aetna. Although Hodjati filed his claim on November 3, 2011, he initially failed to furnish Aetna with all of his medical records; consequently, Aetna sent two letters, dated December 7 and 14, 2011, requesting all of the relevant documents. (A.R. 326, 328). On January 23, 2012, Aetna provided Hodjati with a 30 day extension to provide the records. (*Id.*). Two weeks later, Aetna reminded Hodjati that if he did not provide the records by February 21, 2011, his claim would be denied. (A.R. 334).

**E.     Aetna's Review of Hodjati's Disability Claim**

On March 7, 2012, Aetna sent Hodjati a letter stating that they had reviewed his submissions and determined that he did not satisfy the definition of disability as set forth in the long-term disability plan. (A.R. 350). According to Aetna, Hodjati failed to provide "quantitative exam findings, diagnostic findings, or physical therapy notes" suggesting that Hodjati could not perform his material duties at work. (*Id.*). Aetna also noted that Hodjati did not produce a "cognitive assessment or any performance-based tests of neuropsychological functioning to address or indicate a cognitive impairment." (*Id.*). As a result, Aetna concluded that there was "[i]nsufficient clinical information received to make an assessment of [Hodjati's] functionality." (*Id.*). Aetna alerted Hodjati of his right to appeal the decision and to provide additional evidence of his disability as part of the appeal.

1    (*Id.*).

2              **F.    Aetna's Appeal Procedures**

3              Under Aetna's long-term disability plan, a claimant can ask Aetna to

4    reconsider an adverse benefit determination.  (A.R. 124).  As set forth in the plan,

5    claimants have 180 days to submit an appeal following notice of an adverse benefit

6    determination.  (A.R. 125).  In accordance with 29 C.F.R. § 2560.503-1(h)(2)(iv),

7    Aetna's appeal procedure permits claimants to submit documents and records on

8    appeal that were not submitted during the initial benefits determination.  (A.R.

9    125).  Aetna's policy promises "a decision within 45 calendar days of receipt of the

10   request for an appeal."  (*Id.*).  However, "special circumstances" may warrant "an

11   extension of time not longer than 45 additional calendar days . . . ."  (*Id.*).

12             **G.    Additional Evidence Submitted on Appeal**

13             On May 15, 2012, approximately 60 days after Aetna denied Hodjati's

14   benefits claim, Hodjati notified Aetna that he planned to appeal.  (A.R. 497).

15   Aetna told Hodjati that he could submit additional documentation and evidence

16   related to his claim.  (A.R. 498).  Aetna also promised a final determination by

17   June 28, 2012.  (*Id.*).  Approximately two weeks after filing his appeal, Hodjati

18   spoke with Susan Dorman, a senior appeal specialist at Aetna, and requested more

19   time to submit additional information from Dr. Baer and Dr. Nazareth.  (A.R. 506).

20   Aetna placed its review of Hodjati's appeal on hold until June 29, 2012.  (*Id.*).

21   Dorman also wrote that "[i]f you need more time, please let me know before

22   6/29/12.  If I do not receive the additional information by that date, I will begin my

23   review of your appeal using the existing materials in your claim file."  (*Id.*).

24   Hodjati then submitted additional documentation, as described below.

25             1.    March 5, 2012 Appointment with Doctor Baer

26             Hodjati saw Dr. Baer on March 5, 2012.  (A.R. 502).  Hodjati said that there

27   had been no change in his condition.  He still complained of an "intractable

28   headache" that caused him to be "irritable and interfere[d] with his ability to work."

7

1   (*Id.*).  He bemoaned his "head and [neck] pain and memory loss."  (*Id.*).  But Dr.

2   Baer maintained, "[w]e still do not have a definitive diagnosis."  (*Id.*).

3              2.     April 18, 2012 Appointment with Doctor Baer

4        On April 8, 2012, Dr. Baer documented the same "neurologic symptoms

5   which have been described before."  (A.R. 503).  He "noted no improvement."

6   (*Id.*).

7              3.     May 17, 2012 Appointment with Doctor Baer

8        A month later, Hodjati reported identical symptoms: headaches, tremors, and

9   memory loss.  (A.R. 504).  Hodjati also said that he had experienced vision

10  problems.  But Dr. Baer's physical examination of Hodjati remained unchanged.

11  (*Id.*).

12             4.     April and May Appointment with Doctor Nazareth

13       On April 2 and May 18, 2012, Hodjati met with Dr. Ivor Nazareth, a

14  board-certified neurologist.  (A.R. 510).  Dr. Nazareth prepared one report for the

15  two visits, which he submitted to Aetna on June 1, 2012.  (A.R. 509).  Dr.

16  Nazareth's report included a thorough review of Hodjati's symptom history as well

17  as the results of a neurological evaluation.  The report started with an explanation

18  of Hodjati's medical history: he began experiencing daily headaches in June or July

19  2011. (*Id.*).  Hodjati had occasional nausea, but generally no throbbing sensations,

20  vomiting, or vision disturbances—three common symptoms of migraine

21  headaches.  (*Id.*).  Hodjati reported that there were no particular aggravating or

22  relieving factors for his headaches, which he described as "severe and

23  unremitting."  (*Id.*).   Hodjati did not report any history of head injuries.

24       Hodjati then described his symptoms' effects on his work.  He said that the

25  pain made him forgetful.  (*Id.*).  He also complained of difficulties with

26  presentations—a common task since he was the manager of a small company.

27  Specifically, Hodjati said that prior to his symptoms, he was capable of speaking

28  extemporaneously, without the aid of notes.  (*Id.*)  However, since approximately

August 2011, Hodjati stated that he had to cancel meetings because his "mind [would go] blank." (*Id.*).  Furthermore, Hodjati's hand tremors caused him a great deal of embarrassment (e.g., if he was holding a cup of coffee, the cup would rattle). (*Id.*).

Dr. Nazareth conducted a clinical examination of Hodjati on May 2, 2012. (A.R. 510-11).  As part of the examination, Dr. Nazareth administered a Mini Mental State Examination test (MMSE).  Hodjati scored 27 out of 30 on the MMSE, which according to Dr. Nazareth corresponded with "normal higher function[ing]" of the central nervous system and revealed no "focal neurological deficit." (A.R. 511).  In summarizing the MMSE's results, Dr. Nazareth noted that Hodjati knew the day, the date, the month, and the year as well as the name of the hospital, the state, and the floor he was on. (*Id.*).  Hodjati could recall 2 words out of a three word test after one minute, subtract seven from one hundred serially, spell the word "world" backwards, read and repeat a simple sentence, identify simple objects, follow a three-stage command, and draw a clock with hands indicating a specified time. (*Id.*).  Dr. Nazareth also tested for facial asymmetry, Hodjati's ability to identify smells, and the strength in Hodjati's face, neck, and tongue.  All results were within a normal range. (*Id.*).  As with Dr. Baer, Dr. Nazareth did see a tremor in Hodjati's fingers and hands when outstretched in front of him, but Dr. Nazareth discounted the possibility of Parkinson's disease. (A.R. 512).

Dr. Nazareth concluded that Hodjati suffered from "common migraine headaches." (*Id.*).  However, because Hodjati did not exhibit any neurological deficits, Dr. Nazareth posited that there might be an underlying psychological issue triggering Hodjati's symptoms. (*Id.*).  Consequently, Dr. Nazareth recommended that Hodjati see a psychologist.  He also suggested "an MR angiogram of the intracranial arteries" if Hodjati's headaches persisted. (*Id.*).  Finally, Dr. Nazareth placed Hodjati on Cymbalta, a serotonin-norepinephrine reuptake inhibitor.

1

### H.     Aetna Hires Dr. Topper to Conduct an Independent Review

2        After receiving Dr. Nazareth's report and Dr. Baer's updated evaluation

3   notes, Aetna hired Dr. Leonid Topper, a board certified neurologist, to review the

4   materials.  (A.R. 550-54).[1]  Dr. Topper found "no evidence of any functional

5   impairment . . . from [a] neurological point of view."  (A.R. 553).  He concluded

6   that Hodjati's "symptoms do not meet the criteria for any specific neurological

7   condition."  (*Id.*).  And he challenged Dr. Nazareth's migraine diagnosis because

8   Hodjati did not have a history of headaches until the age of 51, which was "very

9   atypical."  (*Id.*).  Dr. Topper also noted that "migraine by itself is not expected to

10  cause any significant memory problems," and Hodjati's "[d]evelopment of [a] hand

11  tremor around the same time is also unusual and may point to a single underlying

12  psychological cause such as stress or anxiety."  (*Id.*).

13       Furthermore, Dr. Topper said that "multiple primary care visits and several

14  neurology visits do not indicate a single instance of the claimant appearing

15  uncomfortable or being in visible pain."  (*Id.*).  Rather, Hodjati's symptoms were

16  "entirely self-reported and do[] not meet recognizable patterns of neurological

17  conditions."  (*Id.*).

18

### I.     Aetna Closes the Record of Appeal and Upholds the Denial of

19  ### Benefits

20       On July 2, 2012, Aetna notified Hodjati that it "completed [its] review of

21  [his] appeal of the denial of [] LTD benefits" and decided to uphold its denial.

22  (A.R. 565).  Aetna maintained that the record did not identify a specific functional

23  deficit.  Aetna found that Hodjati's CT scan and neurological examinations

24  revealed no abnormalities; moreover, Hodjati never exhibited signs of distress,

25  visible pain, memory loss, or difficulty with concentration in his examinations.

26

27

28       [1]    Dr. Topper did not observe Hodjati personally.  Dr. Topper tried to reach Drs. Baer and
Nazareth, but his calls were unreturned.  (A.R. 552).  Consequently, Dr. Topper limited his
review to Hodjati's medical records.  (*Id.*).

(A.R. 566).  Aetna considered Hodjati's hand tremor, but it concluded that the termor did not impair his ability to work.  (*Id.*).  And although both Dr. Baer and Dr. Nazareth had documented Hodjati's constant headaches, Aetna discounted these symptoms because they were self-reported.  (*Id.*).  Aetna determined that "there was insufficient medical evidence to support [Hodjati's] inability to perform the material duties of [his] own occupation."  (*Id.*).  Aetna notified Hodjati that if he disagreed with Aetna's determination, he had the right to bring a civil action under section 502(a) of ERISA.  (*Id.*).

**J.     Hodjati's Doctors Submit Additional Evidence After Aetna Closes the Appeal**

On July 31, 2012, approximately one month after Aetna upheld its denial of benefits decision, Dr. Baer sent Aetna a letter containing a neuropsychological assessment performed by Dr. Raila Horne, a doctor of psychology.  (A.R. 567).  Dr. Baer said he had received Dr. Horne's report from Dr. Nazareth "in the past week," and he suggested that the findings of Dr. Horne's report were consistent with severe disability and a diagnosis of dementia.  (*Id.*).  Included in Dr. Baer's letter was a fax from Dr. Nazareth on July 30, 2012, sending Dr. Baer the report from Dr. Horne, which was dated June 21, 2012.  (A.R. 568-69).

1.     Dr. Horne's June 21, 2012 Neuropsychological Assessment

As with Dr. Baer and Dr. Nazareth's reports, Dr. Horne started by reiterating Hodjati's explanation of his symptom history.  The summary was very similar to the history described above, except it included Hodjati's history of playing soccer—and his concern that soccer headers caused his headaches and memory loss—as well as Hodjati's hospitalization for encephalitis when he was a teenager. (A.R. 571).

Dr. Horne administered a number of neuropsychological tests on Hodjati. One of the tests, the MMSE, was the same test performed three weeks earlier by Dr. Nazareth.  Dr. Horne also administered a Wechsler Adult Intelligence

1  Scale-Third Edition (WAIS-III), a Wechsler Memory Scale-Third Edition
2  (WMS-III), a Controlled Oral Word Association Test (COWAT), a Rey Osterrieth
3  Complex Figure Test, a Parietal Lobe Test, a Wisconsin Card Sorting Test, a Beck
4  Depression Inventory test, and a Beck Anxiety Inventory test.  (A.R. 571-72).  Dr.
5  Horne segmented the results of these tests into 6 categories in her report:
6  orientation, attention, conceptualization and reasoning, language, executive
7  functioning and visual-spatial and motor performance skills, and emotional status.
8  (A.R. 572-74).

9              a.     Orientation:

10        Dr. Horne concluded that Hodjati had "moderate impairment in his
11  orientation to time and severe impairment in his orientation to place on the
12  MMSE." (A.R. 572).  Hodjati

13        did not know the current date, season of the year, address of his
14        appointment, his own home telephone number, or city or county he was
15        currently in.  He also had moderate impairment in recalling simple words
16        after a few minutes delay . . . . He scored only 20/30 on the MMSE.  His
17        memory scores ranged from the extremely low to borderline range on the
18        WMS-III compared to other individuals in his age group.  His working
19        memory was in the 2nd percentile and his general memory only in the 1st
20        percentile.  His immediate memory scores ranged from the 2nd to 9th
21        percentile and his delayed memory scores from the 0.1st to the 6th
22        percentile. His memory scores were within 2 to 3 standard deviations lower
23        than the mean for his age group.  He had difficulty learning new information
24        and was unable to retain and recall information.  He 'blanked out' on many
25        of the tasks and was unable to concentrate on information in order to have
26        it encoded into his brain for further recall and recognition.
27  (*Id.*).

28              b.     Attention

Hodjati could spell simple words backwards, but he could not perform basic arithmetic. (*Id.*). He had "severe impairment in constructing designs on Block Design and severe impairment in matching cards in correct categories according to color, form and number on the WCST." (*Id.*). He also "had severe impairment in solving more intricate problems of logical sequences and identifying missing pieces of designs on Matrix Reasoning and was unable to concentrate and focus on many tasks." (*Id.*).

<u>c.</u>    <u>Conceptualization and Reasoning</u>

Hodjati had "severe impairment in identifying missing parts of designs and utilizing his abstract reasoning skills . . . ." (*Id.*). His "constructional abilities were also severely impaired." (*Id.*). He drew a clock with the correct hours on it, "but [he could] not set it at a specific time . . . ." (A.R. 573).

<u>d.</u>    <u>Language</u>

Hodjati's "verbal initiation was limited on both letter and category fluency on the COWAT and he engaged in verbal intrusions on both letter and category fluency." (*Id.*). However, "he was able to name objects, follow multi-step verbal commands, and read and write simple text." (*Id.*).

<u>e.</u>    <u>Executive Functioning and Visual-Spatial and Motor</u>
<u>Performance Skills</u>

Hodjati was "unable to complete even one full set out of 5 possible ones on the WCST indicating severe impairment in . . . executive functioning and frontal lobe functions." (*Id.*). He worked diligently on "one particular category on the entire test and was unable to shift out of the maladaptive pattern and try a better approach." (*Id.*). However, his "overall motor performance skills seem to be within normal limits despite symptoms of tremor in his hands, and symptoms of unsteadiness and shakiness." (*Id.*).

<u>f.</u>    <u>Emotional Status</u>

Hodjati reported "moderate symptoms of both depression and anxiety

associated with his cognitive decline and how it is affecting his overall life situation." (*Id.*).  Dr. Horne noted that on one test, Hodjati "endorsed symptoms of sadness, pessimism, loss of pleasure, self-dislike and having lost confidence in himself, self-criticalness, increased agitation and restlessness, loss of interest, indecisiveness, loss of energy, insomnia, increased irritability, increased appetite, difficulty concentrating, tiredness and fatigue, and loss of interest in intimacy." (*Id.*).  On a different test, he endorsed symptoms of "being unable to relax, fears of the worst happening, unsteadiness, feeling terrified and nervous, trembling hands and shakiness, fears of losing control, a fear of dying, feeling scared, and sweating not due to heat." (*Id.*).  Dr. Horne concluded that Hodjati's emotional symptoms "seem to be primarily associated with his cognitive decline and how it is affecting his life." (*Id.*).

### g.    Observable Conditions

Hodjati, however, was fairly composed when he discussed his symptoms. (A.R. 571).  But when Hodjati "began working on tasks it was apparent that he ha[d] difficulty with his overall cognition." (*Id.*).  Specifically, Dr. Horne noted that:

> He would draw lines and flip pages impulsively and had obvious difficulty with his visual-spatial skills and other cognitive functions.  He engaged in facial grimacing and presented like a patient with frontal lobe impairment.  His initiation is impaired and he has difficulty with planning and organization.  However, he worked diligently on the tasks and did not appear as a patient with symptoms of depression.  He was obviously having difficulty completing many of the tasks due to cognitive issues.  He also has an exaggerated startle response.  When he dropped a block on the table he reacted like a patient with a brain injury and it is recommended that the etiology of his exaggerated startle response be further explored.

(*Id.*).

14

1          h.     Dr. Horne's Conclusions

2          In summary, Dr. Horne noted that Hodjati had diffuse cognitive impairment

3    and "presented like a patient with frontal lobe impairment."  (A.R. 570, 573).  Dr.

4    Horne stated that it was unclear what was causing Hodjati's neurological decline,

5    but that it was "significant."  (A.R. 573).  She also opined that Hodjati's depression

6    or anxiety was not the cause of his cognitive impairment, but rather it seemed

7    "secondary to [his] cognitive decline."  (A.R. 574).  Dr. Horne concluded by

8    recommending additional neuroimaging tests, such as MRA, CT, PET, or SPECT

9    to "rule out an underlying neurological condition for his headaches and marked

10   cognitive impairment." (*Id.*).

11        **K.     Aetna's Response to Dr. Horne's Report**

12        On August 20, 2012, Aetna sent Hodjati a letter confirming its receipt of Dr.

13   Horne's report.  (A.R. 580).  Aetna noted that in an earlier letter, on July 2, 2012,

14   Aetna had informed Hodjati that it had completed its review of his appeal and was

15   upholding its denial of benefits.  (*Id.*).   Aetna then stated:

16        In that correspondence we told you that if you disagreed with our

17        determination, you had the right to bring a civil action under Section 502(a)

18        of [ERISA].  You have now exhausted the appeal procedures under the

19        group policy; therefore, our decision is not subject to further administrative

20        review.

21   (*Id.*).

22        Nine days later, however, on August 29, 2012, Aetna sent Hodjati a second

23   letter related to Dr. Horne's report.  (A.R. 581).  Again, Aetna confirmed the

24   receipt of Dr. Horne's report.  Aetna then stated, "[t]he submitted medical records

25   were reviewed, and the medicals did not change our opinion." (*Id.*).   Finally,

26   Aetna reminded Hodjati that he had "exhausted the appeal procedures under the

27   group policy," and that Aetna's decision was "not subject to further administrative

28   review." (*Id.*).

15

1    In fact, Aetna had retained a doctor of psychology, Dr. Elana Mendelssohn,

2    to review Hodjati's file.  (A.R. 238).  She reviewed Drs. Baer and Nazareth's

3    reports.  And she ultimately concluded that they lacked findings or observations of

4    cognitive dysfunction.  (*Id.*).

5    Dr. Mendelssohn then turned to Dr. Horne's report.  Dr. Horne's report

6    found significant impairment "across multiple domains," buttressed by a 20/30

7    MMSE score.  (*Id.*).  Dr. Mendelssohn noted Dr. Horne's failure to explain the

8    low score.  (*Id.*).  And Dr. Mendelssohn ventured further criticism: "the level of

9    impairment documented by Dr. Horne is inconsistent with an individual who is

10   capable of taking a taxi when needed [as Hodjati said he did]."  (*Id.*).  Dr.

11   Mendelssohn also wrote that there was "no indication from Dr. Horne as to

12   observed cognitive problems during conversation or clinical interview, which

13   would be expected given the level of performance reported on cognitive tests."

14   (*Id.*).  Moreover, Dr. Mendelssohn wrote that "there was no indication that Dr.

15   Horne assessed [the] validity of [her] test findings given that the evaluation did not

16   include formal measures of symptom validity."  (*Id.*).  As a result, Dr.

17   Mendelssohn concluded that "the nature and extent of [Hodjati's]

18   neuropsychological functioning could not be ascertained due to the questionable

19   validity of the claimant's clinical presentation and inconsistencies noted."  (*Id.*).

20       **L.    March 29, 2013 MRI**

21   About half a year later, Dr. Ronald Fisk requested that Hodjati undergo

22   another MRI.  On March 29, 2013, Cedar Sinai performed the MRI.  (A.R. 592).

23   Two doctors reviewed the MRI, and they found "diffuse cerebral atrophy, greater

24   than expected for the patient's age" as well as "possible slight increased T2 FLAIR

25   signal within the frontal cortex . . . which may show minimal diffusion restriction."

26   (A.R. 593).  However, the reviewing doctors did not provide a definitive diagnosis

27   and instead recommended further testing.  (*Id.*).

28   Hodjati's attorney sent a copy of the MRI report to Aetna on June 10, 2013.

1    (A.R. 594).  Aetna acknowledged receipt, but it did not confirm whether it

2    reviewed the new MRI report.  (*Id.*).  Plaintiff brought suit approximately one

3    month later.

4    **III.    DISCUSSION**

5         **A.    Standard of Review**

6         District courts reviewing denials of benefits under ERISA must apply one

7    of two standards of review, depending on the language of the plan at issue.

8    *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989).  The default

9    standard is de novo review.  *Id.* at 115.  If, however, the "benefit plan gives the

10   administrator or fiduciary discretionary authority to determine eligibility for

11   benefits or to construe the terms of the plan," the decision to deny benefits and the

12   interpretation of the plan are reviewed for abuse of discretion.  *Id.*  In order for a

13   plan to alter the standard of review from de novo to abuse of discretion, "the plan

14   must unambiguously provide discretion to the administrator."  *Abatie v. Alta*

15   *Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir.2006) (en banc) (citing *Kearney*

16   *v. Standard Ins. Co.*, 175 F.3d 1084, 1090 (9th Cir.1999) (en banc)).

17        In the instant case, the Group Accident and Health Insurance Policy entered

18   into by Aetna and ADP unambiguously vests Aetna with discretionary authority to

19   determine eligibility for benefits and to construe the terms of the plan.  (A.R. 59).

20        Hodjati argues that despite this grant of discretionary authority to Aetna, that

21   a de novo standard applies because any grant of discretionary authority contained

22   in the policy was rendered void and unenforceable by California Insurance Code

23   section 10110.6.

24        California Insurance Code section 10110.6 provides in relevant part:

25        (a) If a policy, contract, certificate, or agreement offered, issued, delivered,

26        or renewed, whether or not in California, that provides or funds life

27        insurance or disability insurance coverage for any California resident

28        contains a provision that reserves discretionary authority to the insurer, or

an agent of the insurer, to determine eligibility for benefits or coverage, to interpret the terms of the policy, contract, certificate, or agreement, or to provide standards of interpretation or review that are inconsistent with the laws of this state, that provision is void and unenforceable.

Cal. Ins. Code § 10110.6.  The statute defines "renewed" as "continued in force on or after the policy's anniversary date."  *Id.*  In addition, the statute defines discretionary authority as "a policy provision that has the effect of conferring discretion on an insurer . . . to determine entitlement to benefits or that, in turn, could lead to a deferential standard of review by any reviewing court."  *Id.*

Section 10110.6 became effective on January 1, 2012.  *Id.*  As the district court noted in *Gonda*, the pertinent issues in determining whether Section 10110.6 applies here are: "(1) whether Plaintiff's claim accrued after the statute's effective date, and, if so, (2) whether the policy was renewed after the statute's effective date, but before Plaintiff's claim accrued."  *Gonda v. The Permanente Med. Group, Inc.*, 10 F. Supp. 3d 1091, 1094 (N.D. Cal. 2014).

As to the first question, the Ninth Circuit has held that claims based on a denial of benefits under ERISA accrue at the time benefits are denied.  *See Grosz–Salomon v. Paul Revere Life Insurance*, 237 F.3d 1154, 1160-61 (9th Cir. 2001); *Menhorn v. Firestone Tire & Rubber Co.*, 738 F.2d 1496, 1501 (9th Cir. 1984) ("We accept the proposition that an ERISA cause of action based on a denial of benefits accrues at the time the benefits are denied.").  And the relevant denial date is the date that the insurer has completed all of its internal reviews of a benefits decision.  *See Williams v. Ironworkers Local 16 Pension Fund*, 178 Fed. Appx. 235, 236-37 (4th Cir. 2006) (holding that a claimants action accrued on the date of this final denial); *Dameron v. Sinai Hosp. of Baltimore, Inc.*, 595 F. Supp. 1404 (D. Md. 1984) (holding that denial of benefits claim accrued on the date a denial of benefits was upheld by the insurer during the insurer's internal appeals process); *Gonda*, 10 F. Supp. 3d at 1094 ("Plaintiff's ERISA claim accrued . . .

1    when [the insurer] denied his final appeal.").  In the instant case, Aetna denied

2    Hodjati's appeal on July 2, 2012, well after Section 10110.6's effective date.

3        The second relevant question in determining whether the discretionary

4    clause in the policy at issue is void is whether the policy was "offered, issued,

5    delivered, or renewed" after January 1, 2012—the effective date of Section

6    10110.6—but before Hodjati's claim accrued.  *See Stephan v. Unum Life Ins. Co. of*

7    *Am.*, 697 F.3d 917, 927 (9th Cir.2012) ("Each renewal incorporates any changes in

8    the law that occurred prior to the renewal.").  In the instant case, Aetna's policy

9    became effective on June 1, 2010.  (A.R. 31).  The policy's initial term was a

10   twelve-month period; however, the policy automatically renews for each additional

11   twelve-month period thereafter.  (*Id.*).  Thus, the policy renewed on June 1, 2011,

12   and again on June 1, 2012.  (*Id.*).  Because the policy's June 1, 2012 renewal

13   occurred after Section 10110.6's effective date, but before Hodjati's claim accrued

14   on July 2, 2012, the policy's discretionary language is void.

15       Aetna argues that Section 10110.6 only voids such discretionary language in

16   benefits *policies*, not discretionary language located elsewhere.  Aetna submits that

17   the Summary Plan Description, which reiterates the discretionary authority lodged

18   by the policy, controls even if the policy's language is void under Section 10110.6.

19   Aetna's argument is unpersuasive.  The discretionary authority granted to Aetna in

20   ADP's Summary Plan Description is not an independent grant of discretion.

21   Rather, it is tied directly to the discretion granted to Aetna in the insurance policy

22   executed between Aetna and ADP.  The Summary Plan Description is, as the title

23   suggests, simply a summary of the benefits ADP provides its employees, rather

24   than an actual insurance contract providing and governing benefits.  Indeed, the

25   Summary Plan Description even states that its purpose is to provide a "clear,

26   concise, description of your benefits," without using "complex language and legal

27   terms," but that the actual plan document "contains more detailed information that

28   governs the administration of the Plan."  (A.R. 601).  Additionally, the Summary

Plan Description explains Aetna's discretionary authority is based on "the terms of the insurance contracts issued for the benefit options under the Plan."  (A.R. 646). Because the Summary Plan Description simply summarizes the insurance policy discretionary language, which is void under Section 10110.6, Aetna cannot use the Summary Plan Description to avoid Section 10110.6's mandate.

Other district courts have reached the same conclusions when faced with similar facts.  In *Gonda*, the district court held that an argument akin to Aetna's "rest[ed] on the untenable assumption that a description of the Plan somehow trumps the terms of the Plan itself." *Gonda*, 10 F. Supp. 3d at 1095. *Gonda* also noted that under this logic Section 10110.6 would be "practically meaningless." *Id.*  Similarly, in *Rapolla*, the district court held that "the Policy and the Plan are a single composite agreement, and for that reason, section 10110.6 applies to the delegation provisions at issue." *Rapolla v. Waste Mgmt. Employee Benefits Plan*, No. 13-cv-2860-JST, 2014 WL 2918863, at *6 (N.D. Cal. June 25, 2014).  The district court in *Orzechowski* reached a different conclusion.  *See Orzechowski v. Boeing Co. Non-Union Long-Term Disability Plan*, No. 12-cv-1905, 2014 WL 979191, at *9 (C.D. Cal. Mar. 12, 2014).  There, the court held that although Section 10110.6 voided discretionary language in a policy, it did not avoid similar discretionary language in a disability plan.  *Id.*  The court reasoned that the claimant was suing under ERISA for denial of benefits under the plan not the insurance policy.  *Id.  Orzechowski*, however, is distinguishable.  There, evidence existed that the disability plan itself, rather than simply the Summary Plan Description, contained discretionary language.  Here, in contrast, Aetna has not pointed to any discretionary language in the long-term disability plan itself; and, the Summary Plan Description simply summarizes the discretionary language set out in Aetna's insurance policy.

In sum, although the insurance policy at issue includes the type of discretionary language that would warrant an abuse of discretion standard of

1   review under *Firestone*, California Insurance Code section 10110.06 renders this

2   language void. As a result, the Court concludes that the default de novo standard

3   of review applies.[2]

4       **B.   Admissibility**

5       In conducting its de novo review, the Court must determine the admissibility

6   of two pieces of evidence: (1) Dr. Horne's report dated June 21, 2012 and (2) the

7   MRI report dated March 29, 2013. Aetna received both pieces of evidence after it

8   closed its appeal. Dr. Horne, however, completed her report before the appeal

9   closed, and Aetna said its decision stood even after examining the document.

10  (A.R. 581). In contrast, Aetna did not consider the MRI, which occurred nine

11  months after the appeal closed.

12         **1.   Legal Rule**

13      Although an abuse of discretion standard limits the Court's review to the

14  record before the plan administrator, *McKenzie v. General Tel. Co.*, 41 F.3d 1310,

15  1316 (9th Cir. 1994), this restriction does not necessarily apply to a de novo

16  review. *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d

17  938, 944 (9th Cir. 1995).

18      The Ninth Circuit agrees with the Third, Fourth, Seventh, Eighth, and

19  Eleventh Circuits that new evidence, not part of the administrative record, "may be

20  considered under certain circumstances to enable the full exercise of informed and

21  independent judgment." *Mongeluzo*, 46 F.3d at 943. The district court should

22

23     [2]    Although not argued by Aetna, the Court notes that California Insurance Code section

24        10110.6 is not preempted by ERISA's express preemption clause, as set forth in 29 U.S.C.
          § 1144(a). The Ninth Circuit has generally observed that state laws regulating

25        discretionary clauses in insurance policies fall under ERISA's savings clause, and thus are
          not preempted. *See Standard Ins. Co. v. Morrison*, 584 F.3d 837, 842 (9th Cir. 2009)

26        ("The practice of disapproving discretionary clauses is thus saved from preemption under
          29 U.S.C. § 1144(a) by the savings clause in section 1144(b)."). As a result, at least two

27        district courts decided that under *Morrison*, Section 10110.6 escapes preemption. *Cerone
          v. Reliance Standard Life Ins. Co.*, 9 F. Supp. 3d 1145, 1151-52 (S.D. Cal. 2014); *Gonda*,

28        10 F. Supp. 3d at 1095; *see also Curran v. United of Omaha Life Ins. Co.*, — F. Supp. 2d
          —, 2014 WL 3973111, at *4-7 (S.D. Cal. July 15, 2014) (assuming, without deciding, that
          Section 10110.6 was not preempted). The Court agrees.

exercise its discretion, however, "only when circumstances clearly establish that additional evidence is necessary to conduct an adequate de novo review of the benefit decision." *Id.* at 944 (quoting *Quesinberry v. Life. Ins. Co. of N. Am.*, 987 F.2d 1017, 1025 (4th Cir. 1993) (en banc).  And "a district court should not take additional evidence merely because someone at a later time comes up with new evidence." *Opeta v. Northwest Airlines Pension Plan for Contract Employees*, 484 F.3d 1211, 1217 (9th Cir. 2007) (internal citation and quotation marks omitted). Indeed, "[i]n most cases, only the evidence that was before the plan administrator at the time of determination should be considered. *Id.* (internal citation and quotation marks omitted).

> The Fourth Circuit's *Quesinberry* decision describes the paradigmatic "circumstances" where introduction of evidence beyond the administrative record is necessary:

> claims that require consideration of complex medical questions or issues regarding the credibility of medical experts; the availability of very limited administrative review procedures with little or no evidentiary record; the necessity of evidence regarding interpretation of the terms of the plan rather than specific historical facts; instances where the payor and the administrator are the same entity and the court is concerned about impartiality; claims which would have been insurance contract claims prior to ERISA; and circumstances in which there is additional evidence that the claimant could not have presented in the administrative process.

987 F.2d at 1027; *accord Opeta*, 483 F.3d at 1217 (adopting this list).  Although this list is not exhaustive, it is "a guide for district courts." *Id.*; *accord Micha v. Sun Life Assurance Co. of Canada*, 789 F. Supp. 2d 1248, 1257-58 (S.D. Cal. 2011).  The touchstone of the analysis remains "whether each piece of extrinsic evidence [is] necessary for the district court to conduct an adequate de novo review." *Opeta*, 484 F.3d at 1218.

1          2.      Analysis

2                   a.      Dr. Horne's Report

3          Dr. Horne's report—which Aetna said it considered—is admissible.  Two

4  independent grounds exist for its admissibility.  Although there is considerable

5  medical evidence in the record outside this report, it sheds light on a complex

6  medical question—the scope and ramifications of indeterminate and nebulous

7  neurologic problem—and is therefore admissible.  *See Quesinberry*, 987 F.2d at

8  1027.

9          Second, because the report's findings contrast sharply with the other

10 medical reports conducted at the time, it questions the reliability of Hodjati's other

11 doctors.  When Hodjati visited Dr. Nazareth in May 2012, he scored 27 out of 30

12 on the MMSE.  According to Dr. Nazareth, this score corresponded with "normal

13 higher function[ing]" of the central nervous system and revealed no "focal

14 neurological deficit."  (A.R. 511).  However, when Hodjati visited Dr. Horne less

15 than a month later, Hodjati scored 20 out of 30 and exhibited signs of "significant"

16 neurological decline.  (A.R. 573).  Since Dr. Horne's report, if credited, could call

17 into question the reliability of the earlier medical experts,  the Court finds that Dr.

18 Horne's report is necessary to conduct an adequate de novo review.[3]

19 _____

20 [3]      There is one other possible ground for admissibility: the belated-filing rule.  On two
   occasions, the Fifth Circuit held that "[i]f the claimant submits additional information to
21 the administrator, and requests the administrator to reconsider its decision, that additional
   information should be treated as part of the administrative record."  *Estate of Bratton v.*
22 *Nat'l Union Fire Ins. Co. of Pittsburgh, P.A.*, 215 F.3d 516, 521 n.5 (5th Cir. 2000);
   *accord Vega v. Nat'l Life Ins. Services, Inc.*, 188 F.3d 287, 300 (5th Cir. 1999)); *see also*
23 *Brodish v. Federal Express Corp.*, 384 F. Supp. 2d 827, 833-35 (D. Md. 2005) (adopting
   and applying the Fifth Circuit's rule).
24
   The Ninth Circuit has not addressed this avenue of admissibility for late-filed medical
25 reports.  Because Dr. Horne's report is admissible on two separate bases, there is no reason
   to do so here.  However, the Court expresses some concern over whether the rule—at least
26 in its most expansive form—is sound, particularly in light of the Ninth Circuit's
   declaration that "a district court should not take additional evidence merely because
27 someone at a later time comes up with new evidence that was not presented to the plan
   administrator."  *Mongeluzo*, 46 F.3d at 944.  To be specific: the aforementioned cases
28 appear to allow claimants to augment the administrative record if (1) he or she submits the
   evidence well before filing suit and (2) asks the fiduciary to reconsider its decision.  This

1

b.       The MRI Dated March 29, 2013

2          Unlike Dr. Horne's report, the MRI is not admissible.  District courts "should

3    not take additional evidence merely because someone at a later time comes up with

4    new evidence that was not presented to the administrator."  *Mongeluzo*, 46 F.3d at

5    944; *Micha*, 789 F. Supp. 2d at 1266.  The MRI report falls squarely within this

6    restriction.  Unlike Dr. Horne's report, the inconclusive MRI—taken almost a year

7    after the appeal closed—does little to resolve Hodjati's complex medical condition

8    and does not impugn the reliability of the other doctors' findings.  Indeed, the

9    report merely posited that "neurodegenerative disease cannot be entirely excluded."

10   This statement adds little to the ample record; the other reports contain more

11   definitive observations and conclusions.  Therefore, the MRI report is not

12   necessary for the court to conduct its de novo review.  *See Quesinberry*, 987 F.2d

13   at 1027 ("[I]f the evidence is cumulative of what was presented to the plan

14   administrator, or is simply better evidence that the claimant mustered for the claim

15   review, then its admission is not necessary.").

16      **C.      Analysis of Hodjati's Disability**

17         Under the de novo standard of review, the Court gives no deference to

18   Aetna's claim decisions.  Rather, the Court "simply proceeds to evaluate whether

19   the plan administrator correctly or incorrectly denied benefits." *Abatie v. Alta*

20   *Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006); *Schramm v. CNA Fin.*

21   *Corp. Insured Grp. Ben. Program*, 718 F. Supp. 2d 1151, 1162 (N.D. Cal. 2010).

22   Thus, the Court must determine "whether [Hodjati] was disabled as defined by

23   [his] policy."  *Schramm*, 718 F. Supp. 2d at 1162.  Moreover, "[i]n an ERISA case

24   involving de novo review, the plaintiff has the burden of showing entitlement to

25

26   ────────────────

27         one-way street is problematic.  Unilateral augmentation of the record after the appeals
     process ends undermines finality and is vulnerable to unfair manipulation.  Rather, it is
     receipt *and review*—in conjunction—that symbolize the reopening of the administrative
28   record.  At a minimum, both should be required unless the evidence falls within the
     *Quesinberry-Opeta* ambit.

benefits." *Id.*; *accord Richards v. Hewlett-Packard Corp.*, 592 F.3d 232, 239 (1st Cir. 2010); *Sabatino v. Liberty Life Assurance Co. of Boston*, 286 F. Supp. 2d 1222, 1232 (N.D. Cal. 2003).

Therefore, for the first 24 months after his disability materialized, Hodjati must show that he could not "perform the material duties of [his] own occupation solely because of an illness [or] injury; and [his] earnings [were] 80% or less of [his] adjusted predisability earnings." (A.R. 007). After the first 24 months of his disability, Hodjati must show that he was "unable to work at any reasonable occupation solely because of an illness [or] injury." (*Id.*).

Hodjati failed to establish that he suffers from any disability that prevents him from performing the material duties of his occupation. Nine office visits with Dr. Baer spanning from September 8, 2011 until May 17, 2012 led to no definitive neurological diagnosis. (A.R. 324, 325, 332, 333, 339, 345, 502-04). Indeed, time and time again, Dr. Baer noted that Hodjati's neurologic exam was within normal limits. (A.R. 339, 325, 332, 33). And despite Hodjati's repeated claims of intractable headache and memory loss, Dr. Baer could not confirm that Hodjati's self-reported symptoms stemmed from any neurological malady. (A.R. 502). Thus, Hodjati's own treating physician—the doctor most exposed to and familiar with the claimant—did not find evidence of significant neurological impairment. *See Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011) (ascribing more weight to the several physicians who examined the patient in-person). Hodjati's September 2011 CT scan corroborates Dr. Baer's conclusions. It revealed that Hodjati's brain displayed normal architectural features and density characteristics and no masses, brain lesions, or indication of restricted blood supply was evident. (A.R. 347).

Moreover, Hodjati's neurologist, Dr. Nazareth, also could not detect any neurological deficit. In fact, Hodjati's score of 27 out of 30 on the MMSE, according to Dr. Nazareth, corresponded with "normal higher function[ing] of the

central nervous system." (A.R. 511.). Other tests similarly revealed that Hodjati's neurological functioning was normal. (*Id.*). Based on all the test results, Dr. Nazareth surmised that Hodjati suffered from only "common migraine headaches." (A.R. 512). Furthermore, Dr. Nazareth posited that some underlying psychological issue (stress or anxiety) might be responsible for the daily headaches. (*Id.*).

Aetna's physician, Dr. Topper, further corroborated these conclusions. He reviewed the reports submitted by Dr. Baer and Dr. Nazareth, also concluded that there was "no evidence of any functional impairment." (A.R. 553). Dr. Topper even questioned the migraine diagnosis, as the onset of migraines at Hodjati's age was unusual. (*Id.*). Finally, Dr. Topper suspected that the onset of hand tremors may point to a single underlying psychological cause of Hodjati's cognitive decline, namely stress or anxiety. (*Id.*).

Dr. Baer and Nazareth's evaluations, coupled with Dr. Topper's review of the medical evidence, persuades this Court that Hodjati was not disabled—he could have performed the material duties of his occupation (or any reasonable occupation) during his claimed disability period. The absence of any specific diagnosis beyond "common migraine headaches" precludes the Court from finding that Hodjati met his plan's definition of disability.

Hodjati's only evidence in rebuttal is Dr. Horne's report. Dr. Horne, a neuropsychologist, administered several tests and concluded that Hodjati had diffuse cognitive impairment, and although the cause of the neurological decline was unknown, it was "significant." (*Id.*). Moreover, Dr. Horne believed Hodjati's emotional symptoms were not the cause of his cognitive decline, but rather a result of it. (*Id.*).

This report is insufficient to meet Hodjati's burden of establishing his disability. First, the Court questions the reliability of Dr. Horne's report and test findings. For example, the precipitous drop in Hodjati's MMSE score from 27 (normal cognitive functioning) to 20 (severe impairment as to time and place) in

just one month is implausible.  Indeed, Aetna's reviewing physician, Dr.
Mendelssohn commented on Dr. Horne's failure to explain the cause of this seven
point drop.  (A.R. 238).  And many of Dr. Horne's findings were not fully verified.
(*Id.*)  In addition, as Dr. Mendelssohn said, Dr. Horne's conclusions regarding
Hodjati's cognitive abilities are inconsistent with the tasks Hodjati could complete
(such as using taxis).  (A.R. 238, 570).  Furthermore, one would expect that
Hodjati would have exhibited cognitive problems during his clinical interview with
Dr. Horne, given that Hodjati could not  recall what season it was or the city he
was in.  Nevertheless, when Hodjati relayed his history and symptoms to Dr.
Horne, he was "composed and able to participate" without difficulty.  (A.R. 571).
Such inconsistencies—in the face of substantial countervailing evidence (most of
which comes from Hodjati's own doctors)—are fatal to Hodjati's position.

In sum, Hodjati did not carry his burden of establishing that he was disabled
and unable to perform the material duties of his occupation.

**IV.    CONCLUSION**

For the foregoing reasons, the Court AFFIRMS the underlying denial of
benefits and GRANTS judgment in favor of Defendants.

IT IS SO ORDERED.

Dated: December 29, 2014

_____
STEPHEN V. WILSON
United States District Judge